Filed 12/21/16 On transfer from Supreme Court

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B245657 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA065446) |
| v. | |
| JUAN RAMON MERAZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Daniel B. Feldstern, Judge. Affirmed as modified.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Juan Ramon Meraz.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant Juan M. Chambasis.

_____

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 1 and 3 through 7 of the Discussion.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant Victor Bibiano.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

Codefendants Juan Ramon Meraz, Juan M. Chambasis, and Victor Bibiano separately appeal their convictions and sentences for murder, attempted murder, and discharging a firearm at an inhabited dwelling following a gang-related shooting that killed two victims and seriously injured a third. We previously affirmed the judgments with certain corrections to their sentences. Our high court granted review and transferred the case to us for reconsideration of defendants' confrontation clause challenges to the gang expert's testimony in light of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). In the published portion of this opinion, we conclude reversal is not warranted under *Sanchez*, so we once again affirm the judgments as modified.

## PROCEDURAL HISTORY

Appellants were jointly charged with the murders of Javier Zamora and Justin Curiel (Pen. Code, § 187, subd. (a); counts 1 & 2),[1] the attempted premeditated murder of Jose Santa Ana (§§ 187, subd. (a), 664; count 3), and discharging a firearm at an

---

[1] Undesignated statutory citations are to the Penal Code unless otherwise noted.

inhabited dwelling (§ 246; count 4).  For the murder counts, multiple-murder and gang-murder special circumstances were alleged.  (§ 190.2, subd. (a)(3), (22).)  A variety of firearm and gang enhancements were also alleged.[2]  A first trial ended in a mistrial after the jury deadlocked.  On retrial, the jury found appellants guilty on all counts and found all special circumstances and enhancements true.  At separate sentencing hearings, the trial court sentenced each appellant to life without the possibility of parole, a consecutive life sentence, and an additional 50 years to life in state prison as follows:  life without the possibility of parole for count 1, plus 25 years to life pursuant to section 12022.53, subdivision (d); and a consecutive life sentence on count 3, plus 25 years to life pursuant to section 12022.53, subdivision (d).  The court imposed concurrent sentences on counts 2 and 4 and stayed the remaining enhancements for counts 1 and 3.[3]  The court imposed various fines, fees, and custody credits discussed further, *post*, as necessary.  Appellants separately appealed.

## STATEMENT OF FACTS

The shooting in this case was part of a long-standing rivalry between two gangs in Pacoima:  Pacoima Terra Bella (Terra Bella) and the Pacoima Project Boys (Project Boys).  The rivalry reached a heated point on May 5, 2008, when Project Boys member Jose Avila shot and killed Terra Bella member Alejandro Villa.  Avila was convicted of the murder.  The shooting by

---

[2]     It was alleged Chambasis had a prior strike conviction, which the trial court ultimately found not to be true.

[3]     The court struck the firearm enhancements for count 4 on dual-use grounds.

3

appellants here—all Terra Bella members—was viewed as retaliation for Villa's murder.

On September 20, 2009, the day of the shooting, 16-year-old Project Boys member Santa Ana lived at the San Fernando Gardens housing project, which was in Project Boys gang territory. Santa Ana and fellow Project Boys member Zamora were on the porch of Rosemary Hurtado's apartment when Curiel joined them. Curiel was not a gang member and had just moved into San Fernando Gardens. About five minutes after Curiel arrived, three males approached, carrying firearms. Santa Ana recognized them and identified them at trial as Bibiano, also known as "Blacky"; Meraz, also known as "Curley"; and Chambasis, also known as "Bash." Bibiano asked the trio where they were from, which Santa Ana knew was gang parlance asking which gang they were from. Curiel tried to say he "wasn't from anywhere." One of the appellants said they were from Terra Bella. Meraz told a group of young children playing nearby, including Curiel's brother, to leave. When the children left, appellants began shooting.

Before the shooting, 12-year-old S.B. was playing near the porch where the shooting took place. She noticed three males approaching the victims on the porch. One of the approaching males had a gun in his hand, and S.B. identified him at trial as Chambasis. As the shooting began, she grabbed her younger brother and carried him inside her house.

Zamora was shot seven times, three of which were fatal. Curiel was shot four times, two of which were fatal. Santa Ana was shot five times, and although he survived, he acted like he was dead. After appellants fled back the way they had come,

Santa Ana saw his friends were dead, so he tried to walk toward a nearby fire station but collapsed on the way.

Hurtado heard the gunshots, emerged from her apartment to investigate, and saw Santa Ana and the other two victims. As she checked on her children, Santa Ana walked away. When she found him heading toward the fire station, he repeatedly told her "Terra Bella" shot him.

Several Los Angeles police officers arrived at the scene. One officer approached Santa Ana and said to him, "You're going to die. Who shot you? What happened?" Santa Ana responded, "Blacky from Terra Bella Street," i.e., Bibiano, shot him. He told another officer "Blacky" had tattoos of a "1" and a "3" on his forearms.[4] At the hospital, Santa Ana was shown a series of photographs and he identified all three appellants as the shooters.

Thirteen shell casings, eight bullets, and two partial bullets were recovered from the scene. A ballistics expert linked one of the casings to a gun used by Timothy Jenkins in a shooting eight days earlier. Jenkins was a member of the Pacoima Pirus gang, which had a friendly relationship with Terra Bella. He told police he traded the gun to Chambasis for marijuana on the day before the shooting at San Fernando Gardens.

All three appellants were arrested the day after the shooting. When officers contacted Meraz, he briefly attempted to flee but was apprehended. Officers recovered a cell phone and a belt buckle with the letter "T" on it. Chambasis and Bibiano were

---

[4] When Bibiano was arrested the following day, he had tattoos matching Santa Ana's description, although by the time of trial he had turned the "1" into a "T" and the "3" into a "B."

arrested when officers stopped the car they were riding in together.  Bibiano gave officers a false name.  A search of Chambasis's residence yielded two Pittsburgh Pirates baseball caps with "RIP, Bones" and "TBST" written on them, a rifle, a shotgun, and other items with his name on them.

While in custody, Bibiano and Meraz were placed in a cell together and their conversation was secretly recorded.  Bibiano said he was going to "do life."  He said officers got him in "Bash's car" about an hour before.  He claimed he did not know anything because he "was not even there."  Meraz also claimed he "wasn't even there" and said he did not know Bash.  Bibiano responded, "Me neither."  Bibiano said, "The rest of my life has gone to waste," to which Meraz responded, "All because of some stupid shit."  Bibiano said Bash had told him, "Don't trip, dude," and Bibiano had responded, "I'm no fuckin' rat, man."  Meraz commented, "If you rat, foo', they'll make paperwork on you," and "when you get to the big house, they fuck you up, foo'.  Don't say anything."  Bibiano said, "Yeah, I know.  It doesn't matter ain't gonna happen.  I don't even got nothing.  Shit, I was not even there, man.  What the fuck I'm gonna tell you?"  Meraz claimed all the police had was "a bunch of gossip."  Meraz said, "What saved me foo', is that they asked me what I was doing.  And I told him that—that I was with Paula.  And they called her and she said yes."  Bibiano responded, "Hopefully my girl will also say yes."  They talked about serving life in prison and Meraz said he had "lost everything . . . [a]ll because of one thing."  Bibiano said, "We'll never get out, dude.  Never."  Bibiano said something about leaving the house and "I wasn't even gonna go out, foo'.  I should've stayed, I should've stayed."  Meraz agreed.  When

Bibiano said the police showed him a picture of Meraz, Meraz responded, "We should've worn masks. Stupid ass, Bash."

During an interview about the murders, Bibiano began to cry. He denied knowing Chambasis.

At an interview with the police after appellants were arrested, Luis E. Orozco said Bibiano "jumped" him into the gang and Terra Bella had "problems" with Project Boys after Villa's murder. Orozco was with appellants at a park three to five miles away from the San Fernando Gardens at around 5:00 p.m. the day of the shooting. He let Bibiano borrow his cell phone and Bibiano left the park around 5:20 p.m. After Bibiano left the park, he called Orozco later at home and told him, "Don't go outside there's too much cops." At some point, Bibiano returned to say goodbye to his girlfriend and gave Orozco his phone back. Bibiano began to watch the news, which Orozco found suspicious. In response to a story showing "ladies crying" in "the Projects right here," Bibiano seemed nervous and said, "Man, fuck. I got to get the fuck out of here." He said he had "fucked up" and he was "going to hell." A recording of the news broadcast from that day showed photographs of Zamora and Curiel with signs reading "Rest in peace, Javier, Pimps" and "Rest in peace, Justin."

A search of the phone Orozco said he lent Bibiano and the phone recovered from Meraz revealed a text message was sent from Meraz's phone to Orozco's phone at 1:17 p.m. the day after the shooting reading, "I'm going to Sinaloa tonight. I already got my ticket." At 1:27 p.m., Orozco's phone responded, "Can I go with you, or what[?]" At 7:05 p.m. on the day of the shooting, Meraz's phone sent a text message to a different number reading, "On the run."

7

Officer Tyler Adams testified as a gang expert for the prosecution. He was assigned to monitor Terra Bella and he gathered information by talking to gang members, both in and out of custody, as well as interviewing them as part of conducting probation and parole services. Terra Bella had approximately 30 members and their symbols included "13" to signify affiliation with the Mexican Mafia and the hand signals and initials "TB" and "TBS." The gang's primary activities were burglary, grand theft, carrying loaded and concealed firearms, assault with firearms, assault likely to cause great bodily injury, and felony vandalism. Officer Adams identified convictions of several Terra Bella gang members for those types of crimes. He confirmed the rivalry between Terra Bella and Project Boys, which became heated after Avila murdered Villa in May 2008.

Officer Adams confirmed all three appellants were Terra Bella gang members. Meraz had previously admitted he was a Terra Bella gang member, and when Officer Adams had previously stopped him, he had been with other gang members, had been wearing gang attire, and had a "PTB" tattoo inside his bottom lip. During one stop, Meraz said he was trying to get into Terra Bella and had to "smoke somebody" to do so. Bibiano had gang tattoos and when Officer Adams previously stopped him, he had been with other gang members. Officer Adams had also obtained a photograph showing Bibiano throwing gang hand signals. Chambasis also had gang tattoos and Officer Adams had previously stopped him in the presence of other Terra Bella gang members. Since his arrest, Chambasis had added tattoos to his face and neck.

Officer Adams testified to the importance of respect in a gang and "putting in work" by typically committing crimes to

move up in the gang. He believed the shooting in this case was bold within Terra Bella, given it occurred during the day in rival gang territory. When given a hypothetical question tracking the facts of the shooting, Officer Adams opined the shooting was retaliatory for Villa's murder. He also opined the murders were associated with, committed for, and likely committed at the direction of Terra Bella.

Appellants did not testify. In his defense, Chambasis offered evidence that no fingerprint analysis was done on the casings recovered at the scene of the shooting. He elicited testimony that when police interviewed S.B. at the police station after the shooting, she said the gunman she remembered was shorter than the officer interviewing her, who was about five feet 10 inches tall, and had hair. She said the other men did not have guns. When she was shown two books of photographs, she pointed to someone who was not Chambasis and said, "Kind of No. 11 . . . but only had hair." Chambasis also elicited testimony that at the scene of the shooting and later in the hospital, Santa Ana claimed he did not know one of the assailants. In his defense, Bibiano elicited testimony that Santa Ana initially said at the scene of the shooting that he did not know from which direction the gunmen had come. He also said appellants all wore black and Meraz was the one who said, "Where you vatos from." He did not see them in a car.

## DISCUSSION

### 1. Santa Ana Impeachment Evidence[*]

During a break in Santa Ana's direct examination, the parties and the court discussed four possible areas for

---

[*]     See footnote, *ante*, page 1.

impeaching Santa Ana's credibility:  a prior sustained juvenile petition for being a minor in possession of a firearm (former § 12101, subd. (a)(1), now § 29610); a sustained petition for contempt of court relating to a gang injunction (§ 166, subd. (a)(4)); a sustained petition for identity theft (§ 530.5); and a recent arrest for battery of a cohabitant and criminal threats (§§ 243, subd. (e), 422).  After hearing argument from the parties, the court admitted the identity theft petition for impeachment purposes, but excluded the contempt and firearm possession petitions because they were not crimes of moral turpitude.  The court postponed ruling on the domestic violence incident, but eventually excluded it as discussed more fully below.  Appellants argue the trial court abused its discretion and violated their due process rights to confront witnesses and present defenses by excluding evidence of the juvenile firearm possession and the domestic violence incident.  We disagree.

*A. Juvenile Petition for Firearm Possession*

Appellants argue Santa Ana's juvenile petition for possession of a firearm was a crime of moral turpitude, so the court erred and violated their constitutional rights by excluding it for impeachment purposes.  Respondent assumes state law error and argues appellants' constitutional rights were not violated and any state law error was harmless.  We will also assume state law error because we find no constitutional violation and find any state law error harmless.

Limitations to a defendant's cross-examination of a witness do not violate the confrontation clause " 'unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility." ' "  (*People v. Smith* (2007) 40 Cal.4th 483, 513.)

10

Similarly, "the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]  Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.]  If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)  If the trial court erred under state law only, we review the record to determine whether a more favorable outcome was reasonably probable in the absence of the error.  (*Id.* at pp. 1103-1104.)

The trial court's exclusion of Santa Ana's juvenile petition for firearm possession did not deprive appellants of their confrontation and due process rights because the jury heard significant other evidence calling Santa Ana's veracity into doubt. The trial court admitted evidence of Santa Ana's juvenile petition for identity theft, and he was questioned about it in front of the jury.  Santa Ana also admitted he had been a gang member and had placed gang graffiti on a bench at the scene of the shooting, and he admitted he had previously lied under oath that he was not a gang member and he had not done the graffiti.  Santa Ana's juvenile petition for firearm possession was therefore only a subsidiary point that would not have given the jury a significantly different impression of his credibility.

Further, any state law error was harmless because other evidence beyond Santa Ana's testimony overwhelmingly demonstrated appellants' guilt.  S.B. identified Chambasis as one

11

of the gunmen, and ballistics and other evidence linked Chambasis to one of the guns used in the shooting. Meraz and Bibiano were caught on a jail recording making incriminating statements, including Meraz telling Bibiano, "We should've worn masks," which the trial court properly admitted against Bibiano as an adoptive admission as we discuss below. Meraz sent text messages after the shooting that he was "[o]n the run" and he was "going to Sinaloa tonight," to which Bibiano responded, "Can I go with you, or what[?]" Meraz briefly fled from police before he was arrested. When Bibiano watched a news story on the shooting, he said he had "fucked up," he was "going to hell," and he had "to get the fuck out of here." Finally, there was significant evidence of a retaliatory motive for the shooting to avenge the shooting death of a fellow gang member.

B. *Domestic Violence Incident*

Two days after trial began, Santa Ana was arrested for domestic violence and criminal threats. During the parties' and the court's initial discussion of impeachment for Santa Ana, the prosecutor objected to the admission of the incident under Evidence Code section 352, arguing the evidence would be too time consuming and confusing because there was no conviction and because the woman involved in the incident had a "history" that would require the prosecution to "drag[] in the lady so that we can have a little minitrial within a trial." The court expressed concern that it did not have enough information and postponed ruling. The following day the prosecution turned over the police report for the incident to defense counsel.

At a later hearing, Meraz's counsel argued that Santa Ana "went to great lengths to distance himself from his prior life" and repeatedly testified "he no longer is that person that he was

before" and "[t]hat was his greatest mistake he has made," leading the jury to believe he was living a crime-free life. According to Meraz's counsel, the recent domestic violence incident "directly impeaches that. This is only a couple years out from when he last supposedly was" a gang member. The court questioned how the incident involving domestic violence related to Santa Ana distancing himself from being a gang member, but postponed ruling pending further investigation.

Later, Meraz's counsel brought the victim into court, who was reluctant but willing to testify consistent with the police report. Meraz's counsel proffered that she would testify Santa Ana went to her home, jumped out at her from the bushes, and punched her multiple times in the face, head, and body, causing her to fall to the ground. He grabbed her by the hair and pulled her across the concrete several feet until she screamed for help and ran away. Meraz's counsel indicated he planned to ask her about other incidents with Santa Ana as well.

The court noted the police report indicated she had bruising around her eye that looked healed and possibly predated the incident, and she had no other injuries indicating the incident occurred. The report also contained statements from Santa Ana that he was home at the time, the victim had threatened to have him arrested if he did not take care of his children, and she was intoxicated. The court also discussed a "DCFS report" in which the victim was identified "as a perpetrator with 18 prior closed referrals for general neglect and emotional abuse of her children." The court further noted other reports involving the victim returning to Santa Ana's house intoxicated and belligerent in the days following the domestic violence incident. On one occasion, the victim claimed Santa Ana threw her to the floor and began

13

strangling her, but she was able to get away. She told the police at the time she was able to breathe and did not lose consciousness, but later changed her story. Santa Ana denied the incident and according to his mother, the victim jumped over a six-foot-high fence to argue with Santa Ana, and the confrontation did not become physical. Finally, there was a report claiming Santa Ana threatened the victim over the phone, which Santa Ana denied. Instead, he claimed he told the victim to leave him alone and she threatened him, saying he should "watch his back because she was going to have him killed." The court noted these reports created "huge credibility conflicts" in a "he-said/she-said reporting environment where there's an ongoing domestic-related conflict between these two people."

The court explained that the prosecution filed a motion to exclude this evidence pursuant to Evidence Code section 352 because it was not clear who was telling the truth and it was a "messy situation." Meraz's counsel argued the jury could believe Santa Ana was a violent person, contradicting how he presented himself on the stand, and another witness was available to corroborate the threats he made over the phone. The prosecutor responded that Santa Ana had not yet been convicted and presenting the evidence would entail numerous witnesses, shifting the jury's focus away from the main issues.

The court ruled the evidence went to the "collateral" issue of impeachment based on misdemeanor conduct and presented a "classic trial within a trial if I've ever seen one" that would require an "array" of witnesses. Further complicating matters, the victim may have had a valid basis to refuse to testify, and even if she testified, the court could not simply limit the evidence to her testimony in order to be fair to both sides. The court also

14

noted the allegations had not been proven in any court. Thus, because this evidence would consume an undue amount of time and would risk confusing the jury, the court excluded it.

"A trial court has broad discretion under Evidence Code section 352 to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' This discretion allows the trial court broad power to control the presentation of proposed impeachment evidence ' " 'to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " ' " (*People v. Mills* (2010) 48 Cal.4th 158, 195.) While impeachment evidence of conduct involving moral turpitude not amounting to a felony is admissible, it "is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296-297.) We review the trial court's exclusion of impeachment evidence for abuse of discretion. (*Mills, supra*, at p. 195.)[5]

---

[5]     Meraz suggests our review is de novo because the evidence was admissible under Evidence Code section 1101. Whether or not correct, the trial court excluded the evidence pursuant to Evidence Code section 352, so our review is for abuse of discretion.

15

The trial court acted within its discretion in excluding evidence of Santa Ana's recent domestic violence arrest under Evidence Code section 352. The probative value of this evidence was low. Appellants emphasize that Santa Ana gave the impression to the jury that he was fully reformed from his criminal past as a gang member, so evidence of the recent domestic violence incident would have brought his credibility into doubt. If the jury did get this impression, it was weak at best. Santa Ana called being in the gang "a mistak[e in] life that I made" and said, "There was a few times where I did lie. But after I realized I made a big mistake I came clean with the truth to this day." Appellants have not pointed to any testimony where he claimed to be currently crime-free or that he had reformed completely. Moreover, as discussed above, there was other evidence questioning Santa Ana's credibility, so evidence of the domestic violence incident had only limited additional impeachment value. On the other side of the scale, the trial court correctly recognized the reports created a "he-said/she-said reporting environment where there's an ongoing domestic-related conflict between these two people," which the jury would have had to resolve following a substantial minitrial with numerous witnesses, consuming significant time during an already lengthy trial and creating a risk of jury confusion.[6]

---

[6] Meraz cites *Andrews v. City and County of San Francisco* (1998) 205 Cal.App.3d 938, but it is distinguishable. In that case, the Court of Appeal faulted the trial court for excluding all evidence of a witness's past misconduct, thereby leaving the witness's testimony "untarnished," whereas the jury in this case heard other evidence impeaching Santa Ana's credibility. (*Id.* at p. 947.)

16

Nor did the trial court violate appellants' constitutional rights to confrontation and due process. As we concluded with the trial court's exclusion of Santa Ana's juvenile petition for firearm possession, the admission of evidence underlying the domestic violence incident would not have given the jury a significantly different impression of Santa Ana's credibility and appellants were free to cross-examine him and offer other impeachment evidence, so they were not prevented from putting on a defense.

Finally, for reasons already discussed, any error in excluding this impeachment evidence was harmless because the evidence of appellants' guilt was overwhelming.

### 2. *Gang Expert Testimony*

Appellants jointly contend the trial court violated their Sixth Amendment rights to confrontation by allowing Officer Adams to give expert opinions based on out-of-court testimonial hearsay from declarants whom appellants did not have an opportunity to cross-examine. Before our high court decided *Sanchez*, we found no error. Reevaluating appellants' contentions in light of *Sanchez*, we conclude a narrow portion of Officer Adams's testimony was barred by the confrontation clause and state law, but the erroneous admission of that testimony was harmless beyond a reasonable doubt.[7]

---

[7] Respondent argues appellants forfeited this issue by failing to object on confrontation clause grounds in the trial court. Any objection would likely have been futile because the trial court was bound to follow pre-*Sanchez* decisions holding expert "basis" evidence does not violate the confrontation clause. (See, e.g., *People v. Hill* (2011) 191 Cal.App.4th 1104, 1128-1131.) We will therefore address the merits of this claim.

17

*A.* Sanchez

In *Sanchez*, our high court considered the extent to which *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) limits an expert witness from relating case-specific hearsay in explaining the basis for an opinion, and it clarified the application of state hearsay rules to that kind of expert testimony.  It held the case-specific out-of-court statements conveyed by the prosecution's gang expert constituted inadmissible hearsay under state law and, to the extent they were testimonial, ran afoul of *Crawford*. (*Sanchez, supra*, 63 Cal.4th at pp. 670-671.)

As is typical in gang-related prosecutions, the gang expert in *Sanchez* testified to his background and experience "investigating gang-related crime; interacting with gang members, as well as their relatives; and talking to other community members who may have information about gangs and their impact on the areas where they operate.  As part of his duties, [he] read reports about gang investigations; reviewed court records relating to gang prosecutions; read jail letters; and became acquainted with gang symbols, colors, and art work." (*Sanchez, supra,* 63 Cal.4th at p. 671.)  He also testified about the gang to which the defendant allegedly belonged, including its primary activities and the convictions of two gang members demonstrating the gang's pattern of criminal activity.  (*Id.* at p. 672.)  As to the defendant specifically, the expert testified about five contacts defendant had with police reflected in a STEP[8] notice, police reports, and a field identification (FI) card.

---

[8]     This acronym is a reference to the California Street Terrorism Enforcement and Prevention Act.  (Pen. Code, § 186.20 et seq.; *Sanchez, supra*, 63 Cal.4th at p. 672, fn. 3.)

The expert was not present during any of the contacts and only related the information recorded by other officers. Based on this information, the expert opined the defendant was a gang member. (*Id.* at p. 673.)

The defendant challenged the admission of the gang expert's testimony describing the defendant's prior contacts with police, arguing it was testimonial hearsay that violated his confrontation clause rights. (*Sanchez, supra,* 63 Cal.4th at p. 674.) The defendant did *not* challenge the admission of the background testimony from the expert, such as his description of "general gang behavior or descriptions of the . . . gang's conduct and its territory." (*Id.* at p. 698.)

The court explained under *Crawford* and the confrontation clause, a hearsay statement is inadmissible unless it falls within an exception recognized at the time of the Sixth Amendment's adoption or the declarant is unavailable to testify and the defendant had a previous opportunity for cross-examination or that opportunity was forfeited. (*Sanchez, supra*, 63 Cal.4th at p. 680.) Thus, a court's task in evaluating out-of-court statements under hearsay rules and *Crawford* is two-fold: "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez, supra*, at p. 680.)

On the state law question, the court drew a line between an expert's testimony as to general background information and case-specific facts. Traditionally, "an expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds," but experts have not been permitted to convey case-specific hearsay about which the expert has no personal knowledge. (*Sanchez, supra*, 63 Cal.4th at p. 676.) The court defined case-specific facts as "those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid*.) An expert may "testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge." (*Ibid*.) The court gave several examples of this distinction, one of which pertained directly to gang experts: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Id*. at p. 677.)

The court explained that courts frequently avoided any confrontation issues with this kind of expert basis evidence by "concluding that statements related by experts are not hearsay because they 'go only to the basis of [the expert's] opinion and should not be considered for their truth.' " (*Sanchez, supra*, 63

Cal.4th at pp. 680-681.) The court disapproved this reasoning when the expert bases an opinion on case-specific facts about which he or she has no personal knowledge: "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id.* at p. 684, fn. omitted.) Because this testimony is hearsay, it implicates *Crawford* and the confrontation clause if the statements are also testimonial and none of *Crawford*'s exceptions apply. (*Sanchez*, at p. 685.)

The court thus crafted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. omitted.) Canvassing confrontation clause cases, it concluded hearsay statements are testimonial if they are made "primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other

21

purpose unrelated to preserving facts for later use at trial." (*Id.* at p. 689.)

Turning to the facts of the case, the court concluded the police reports, the STEP notice, and potentially the FI card were case-specific testimonial hearsay, violating the confrontation clause. First, the three contacts with the defendant reflected in police reports compiled by the investigating officers during the investigations of those crimes were "statements about a completed crime, made to an investigating officer by a nontestifying witness," which "are generally testimonial unless they are made in the context of an ongoing emergency . . . or for some primary purpose other than preserving facts for use at trial." (*Sanchez, supra*, 63 Cal.4th at p. 694.) It did not matter that the officers summarized the statements or that the defendant himself was not accused of the crimes. (*Id.* at pp. 694-695.) Second, the sworn STEP notice retained by police recording the defendant's biographical and other information was testimonial because it was a formal sworn statement from a police officer that the information was accurate, and its primary purpose was to collect information for later use at trial. (*Sanchez*, at p. 696.) Finally, the FI card memorializing the contact with the defendant could be testimonial, but the court did not decide the issue because the expert's testimony was unclear and confusing on this point. It noted "[i]f the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Id.* at p. 697.)

The court found the confrontation clause violation prejudicial as to the gang enhancements because the main evidence of the defendant's intent to benefit the gang was the

22

expert's recitation of testimonial hearsay. (*Sanchez, supra,* 63 Cal.4th at p. 699.) In doing so, it took care to note the defendant was not challenging the expert's "background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory," which was "based on well-recognized sources in [the expert's] area of expertise. It was relevant and admissible evidence as to the . . . gang's history and general operations." (*Id.* at p. 698.)

*B. Officer Adams's Testimony*

Like the expert in *Sanchez*, Officer Adams testified to his extensive training on gangs generally and how he gathered background information about Terra Bella. For training, he had attended gang courses and conferences; he had trained in the field with an officer who pointed out active gang members; he had responded to gang-related crimes; and he had spoken with gang officers and detectives. He had also been assigned to a gang crime-prevention task force responding to hot spots around Los Angeles, during which he would speak to gang officers and detectives about the gangs involved. As part of the gang unit in the Foothill Division monitoring Terra Bella, he had gathered intelligence on gang membership and rivalries to allow him "to respond more effectively in response to a shooting or any other gang-related crimes." He received the "majority of our intelligence" by "speak[ing] with gang members of all levels and ages, both in and out of custody, whether they're suspects, victims, witnesses, or none of the above. We conduct probation and parole services, at which time we would interview them about just general gang life."

Based on this experience and background, he described the size of Terra Bella, its symbols, and its primary activities, and he

identified the convictions of several Terra Bella members based on court records.  He also described the rivalry between Terra Bella and Project Boys, which became heated after Avila murdered Villa in May 2008.  He further testified to the importance of respect in a gang and "putting in work" by typically committing crimes to move up in the gang, and he believed the shooting in this case was bold because it occurred during the day in rival gang territory.  When given a hypothetical question tracking the facts of the shooting, Officer Adams opined the shooting was retaliatory for Villa's murder and was committed in association with, for, and at the direction of Terra Bella.

As to appellants specifically, he opined all three appellants were Terra Bella gang members.  Critically and in contrast to *Sanchez*, he based his opinion on his personal interactions with each of them, which were recorded on FI cards intended to "document the basics of the stop for any future investigative use."  For example, Officer Adams stopped Meraz two months before the shooting in this case, and Meraz told him he was trying to become a full-fledged member of Terra Bella, and to do so, he needed to "smoke" someone.  Officer Adams interpreted this to mean he needed to shoot someone.  Meraz also wore Terra Bella gang attire during this encounter and had a Terra Bella gang tattoo inside his bottom lip.  Officer Adams contacted Bibiano several times while in the company of other Terra Bella gang members.  He identified Bibiano in photographs in which he was displaying gang hand signals and gang tattoos.  And Officer Adams contacted Chambasis twice in the presence of other gang members.  He took photographs of Chambasis's gang tattoos and belt buckle.

24

Officer Adams did, however, also testify regarding FI cards filled out by other officers. In one, Meraz said he was a member of the Pierce Street gang, not Terra Bella. In another, it was noted Meraz was present with another gang member. In a third, it was noted Meraz was with a "gang member associate." Officer Adams also testified about an arrest report from other officers related to another gang member indicating Meraz was with him when the gang member was arrested.

*C. Analysis*

Appellants argue almost all aspects of Officer Adams's general background testimony were case specific and testimonial, including his opinion that the shooting in this case was in retaliation for Villa's murder, how Terra Bella operates, the gang's primary activities, and the gang's pattern of criminal activity based on convictions of other gang members. In doing so, appellants attack the *sources* of Officer Adams's testimony, namely "out-of-court statements made by both police officers and other gang members." They also focus on how the prosecution used Officer Adams's testimony to prove both the gang enhancements and the retaliatory motive for the shooting in this case. Appellants fundamentally misunderstand the scope and import of *Sanchez*.

Under *Sanchez*, facts are only case specific when they relate "*to the particular events and participants* alleged to have been involved in the case being tried," which in *Sanchez* were the defendant's personal contacts with police reflected in the hearsay police reports, STEP notice, and FI card. (*Sanchez, supra,* 63 Cal.4th at p. 676, italics added.) The court made clear that an expert may still rely on general "background testimony about general gang behavior or descriptions of the . . . gang's conduct

25

and its territory," which is relevant to the "gang's history and general operations." (*Id*. at p. 698.) This plainly includes the general background testimony Officer Adams gave about Terra Bella's operations, primary activities, and pattern of criminal activities, which was unrelated to defendants or the current shooting and mirrored the background testimony the expert gave in *Sanchez*. It also falls in line with the *Sanchez* court's hypothetical example that an expert may testify that a diamond tattoo is "a symbol adopted by a given street gang" and the presence of the tattoo signifies the person belongs to the gang. (*Id*. at p. 677.) By permitting this type of background testimony, the court recognized it may technically be based on hearsay, but an expert may nonetheless rely on it and convey it to the jury in general terms. (*Id*. at p. 685.) Thus, under state law after *Sanchez*, Officer Adams was permitted to testify to non-case-specific general background information about Terra Bella, its rivalry with Project Boys, its primary activities, and its pattern of criminal activity, even if it was based on hearsay sources like gang members and gang officers.[9]

---

[9] Even if we assume Officer Adams's opinion that the shooting was retaliatory for Villa's murder by the rival Project Boys gang was case specific and beyond his personal knowledge, his opinion was still admissible. Another gang officer who assisted in the investigation of the Villa murder testified to the feud between Terra Bella and Project Boys. Officer Adams was permitted to rely on those independently proven facts to opine the current shooting was retaliatory for Villa's murder. (See *Sanchez, supra,* 63 Cal.4th at p. 686 [expert cannot rely on case-specific hearsay unless it is "independently proven by competent evidence"].)

We also conclude that none of this background information was testimonial. Unlike the STEP notice, police reports, and FI card in *Sanchez*, nothing in the record suggests Officer Adams obtained any of this information "primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony." (*Sanchez, supra,* 63 Cal.4th at p. 689.) Officer Adams described the sources of his background information on Terra Bella and the rivalry with Project Boys in only the most general terms. He conveyed no specific statements by anyone with whom he spoke, and reached only general conclusions based on his education, training, and experience. As we explained in a case before *Sanchez*, "[d]ay in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some unspecified criminal prosecution." (*People v. Valadez* (2013) 220 Cal.App.4th 16, 36.) To conclude otherwise would eviscerate the role of gang experts in gang-related prosecutions, a consequence the court in *Sanchez* neither contemplated nor likely intended.[10]

Some portions of Officer Adams's testimony were case specific under *Sanchez*, namely, his interactions with appellants memorialized on FI cards. But unlike the hearsay documents in *Sanchez*, this testimony was not barred under state or federal law because Officer Adams was present during these contacts, had personal knowledge of the facts, and was subject to cross-

---

[10] The certified records of the convictions of other gang members also were not testimonial under *Crawford*. (*People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 [documents showing "acts and events relating to convictions and imprisonments" are not testimonial under the confrontation clause].)

examination at trial.  (*Sanchez, supra,* 63 Cal.4th at pp. 676, 680.)

Respondent concedes, and we agree, state hearsay rules barred the admission of Officer Adams's testimony on the FI cards and arrest report completed by *other* officers outside his presence, all of which conveyed the same type of case-specific information the court barred in *Sanchez*.  Respondent also concedes, and we also agree, the arrest report was testimonial because it was most likely made during an investigation of a completed crime, like the police reports in *Sanchez*.  Respondent disagrees, however, that the FI cards were testimonial because they were "not produced in the course of an ongoing criminal investigation, but rather were produced as investigative tools to help police solve crimes that may not have even occurred at the time F.I. card was produced."  Yet, Officer Adams testified FI cards are created "to document the basics of the stop for any future *investigative use.*"  (Italics added.)  Although the court in *Sanchez* did not decide whether the FI card at issue there was testimonial, it noted the FI card might be if it "was produced in the course of an ongoing criminal investigation."  (*Sanchez, supra,* 63 Cal.4th at p. 697.)  It seems the FI cards here fall close to that line.

In any case, we will assume the FI cards at issue here were testimonial because we conclude their admission and the admission of the arrest report was harmless beyond a reasonable doubt.  (*Sanchez, supra,* 63 Cal.4th at p. 698 [applying federal harmless error standard to confrontation clause violation].)  The FI cards and arrest report purported to show Meraz's membership in Terra Bella, which could be relevant to the retaliatory motive and gang enhancements in this case.  (*Id.* at

28

pp. 698-699 [noting gang membership was not element of gang enhancement but could be relevant to intent to benefit gang element].)  But the evidence was duplicative of and weak compared to the other evidence that overwhelmingly demonstrated his Terra Bella membership.  He admitted his gang affiliation to Officer Adams, explaining he was trying to become a full-fledged member of Terra Bella, and to do so, he needed to "smoke" (i.e., shoot) someone.  And he wore Terra Bella gang attire and had a Terra Bella gang tattoo inside his bottom lip.  To the extent the FI cards and arrest report tended to show Meraz harbored a gang retaliation motive for the shooting, the evidence of retaliation was already overwhelming.  Meraz committed the shooting with fellow gang members Bibiano and Chambasis in the heart of Project Boys territory, the gang responsible for Terra Bella gang member Villa's murder.  And just before the shooting Bibiano asked the victims where they were from, which everyone understood to be a gang challenge.  On this record, any state or federal error in admitting the FI cards and arrest report was harmless beyond a reasonable doubt.

### 3. Admission of Meraz's "Masks" Statement*

Before trial, the trial court held a hearing on the admissibility of Meraz's secretly recorded statement to Bibiano while they were in custody, "We should've worn masks.  Stupid ass, Bash."  Bibiano coughed, but did not respond to the comment.  In seeking its admission, the prosecution argued the statement was an adoptive admission.  The trial court agreed.  It explained at the time of the recording Meraz and Bibiano knew they were in custody for a double homicide, they spoke in

---

\*        See footnote, *ante*, page 1.

29

"hushed, secretive tones, often in Spanish designed to mask their conversation and keep it secretive," and no one from law enforcement was present. During the conversation, they spoke freely and each was "adopting the statements of the other with no disagreements between them." The trial court believed it was "very clear to the court that both defendants are implicating themselves and their co-defendant, Mr. Chambasis." Thus, the "masks" statement was admissible against Bibiano as an adoptive admission.

Bibiano argues on appeal the trial court erred in admitting Meraz's statement against him as an adoptive admission. We review the trial court's ruling for abuse of discretion (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132), and we find none.

"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) " 'If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.] 'For the adoptive admission exception to apply, . . . a direct accusation in so many words is not essential.' [Citation.] 'When a person makes a statement in the presence of a party to an action under the circumstances that would normally call for a response if the

30

statement were untrue, the statement is admissible for the limited purpose of showing the party's reaction to it. [Citations.] His silence, evasion, or equivocation may be considered as a tacit admission of the statements made in his presence.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 (*Riel*).) " 'To warrant admissibility, it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' " (*Id.* at pp. 1189-1190.)

The trial court did not abuse its discretion in admitting Meraz's "masks" statement as an adoptive admission by Bibiano. *Riel* is instructive. In that case, a witness testified that the defendant and two others came to her home, and the defendant told her " 'they had gotten fucked up and that there was a man in a coma.' " (*Riel, supra*, 22 Cal.4th at p. 1188.) When the witness asked the defendant what happened, the other two individuals "did the talking," and one made various statements about what "they" did. (*Ibid.*) On appeal, the defendant argued the statements were not adoptive admissions because it was unclear whether the references to "they" included the defendant. The court found the circumstances supported an inference that the references to "they" included defendant because all three individuals were present, the defendant spoke first, the individual making the "they" statements did so in response to a question directed to the defendant, and if the reference to "they" did not include the defendant, one would have expected the defendant to have clarified that. "The circumstances warranted

31

presenting the evidence to the jury and letting the jury decide what weight to give it." (*Id.* at p. 1189.)

Here, Bibiano was sitting with Meraz while they were in custody alone, there was no indication he did not understand what Meraz meant by the "masks" comment, and the comment called for a denial if Bibiano was not part of the "we" in "We should've worn masks." Meraz's comment also came well into their conversation, during which they spoke freely in hushed tones about their arrests for a double homicide, their potential sentences, and their potential alibis. As the trial court noted, at no point did they disagree with one another. As in *Riel*, the circumstances supported admitting Meraz's "masks" statement against Bibiano and allowing the jury to decide what weight to give it.

### 4. Cumulative Trial Error

We have found only one minor error and assumed one other, but have concluded both were harmless. The cumulative effect of those errors does not warrant reversal.

### 5. Chambasis's Motion to Represent Himself at Sentencing

On the day of Chambasis's sentencing, he moved pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 to substitute his counsel. In an in camera hearing, he expressed dissatisfaction with his counsel's performance during trial. The court asked why he had not brought this up during trial, and he responded, "I don't know anything about law. I didn't. I been researching it now." He said he would like to "go pro per for my Sixth Amendment." When the court told him he was going to be sentenced that day, he indicated he wanted to exercise his Sixth Amendment rights. The court responded, "I think I understand what you're trying to do here." Chambasis's counsel addressed

the complaints and the court indicated it did not "see any issues" with counsel's performance. Chambasis asked if the court was denying him his "Sixth Amendment pro per." The court asked if he was asking to represent himself, and he responded, "Or get another attorney." The court said, "Well, it's a little late in the game for that." It explained, "You have had [defense counsel] on your case for years now. You have been through two trials with him. This is the first time you've mentioned something like this in years. And I'm going to say another thing. I have been watching you and watching your conduct during the trial. You're an extremely manipulative person. And I view part of this effort that you're making right now to avoid being sentenced in this case at this point. And I'm making note of that."

The court asked him to explain why he had not made a complaint about his attorney before now. He responded that he had no one to complain to and he did not know about the law. He said he "look[ed] into it" and discovered he could talk to the court. He raised one of the issues he thought his counsel should have raised at trial, but the court said his counsel was experienced and the court was not going to "second-guess" his decisions. When the court said it understood Chambasis wanted to represent himself, he disagreed, saying he was asking for another lawyer "or I'm going to have to represent myself." The court said his request for another attorney was not timely, so he said, "I'll go pro per." The court explained: "[I]f you want to represent yourself for the sentencing, which will be today, I'm not going to deprive you of that; but you will lose the advocate that you have here who knows more about your case than anybody. And I'm not going to continue the matter, because your request is not timely."

33

The court gave Chambasis two options: "based on the fact that so much time has gone by and you are bringing this up on the very moment of your sentence, that you can have [defense counsel] represent you for the sentencing today or, if you feel so disturbed by that that you want to represent yourself for the sentencing hearing today, you can do that." Chambasis said he wanted to represent himself, but that he would need "[a]t least a month" to prepare for sentencing. The court responded, "Well, if you want time, I'm finding that your request is untimely. I'm prepared and everyone else is prepared to go forward with your sentencing today. I'm not going to grant a continuance. There is not good cause to grant a continuance at this point based upon this late notice. [¶] So my suggestion is you have [defense counsel] represent you for the sentencing, or you can represent yourself today if you're so inclined and want to do that for this sentencing today." Chambasis reiterated that he needed to "study." The court reiterated it would not continue the matter and recommended against Chambasis representing himself. It explained, "I could just as easily deny your request to have you represent yourself pro per, but that puts me between a rock and a hard place in the sense that if you are so inclined to represent yourself for today's purpose, then that would be it. For the sentencing you'd have to waive your right to have an attorney represent you, with all of my counseling you to not do that. Or you can have [defense counsel] represent you." The court gave him a *Faretta*[11] waiver form and repeated that it believed Chambasis was trying to manipulate the court. In the exchange that followed, Chambasis repeatedly said he was not going to

---

[11]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

proceed with the case, and the court repeatedly told him it would not grant him a continuance. Chambasis ultimately decided against representing himself and his counsel represented him at sentencing.

Later in open court, the court further explained it would not have granted Chambasis's request to represent himself due to the "disruptions in my court that were caused by Mr. Chambasis, that throughout the trial proceedings I had received continuous information from the bailiffs of Mr. Chambasis' disruptive behavior and failure to conform to the rules of the court and through the bailiff. He, Mr. Chambasis, during one point in the trial attempted to attack one of the witnesses who was being brought back, had to be brought down, caused a melee in the courtroom. And these would be reasons why the court would not feel comfortable in granting pro per status to a defendant under those circumstances, one not willing to conform to the rules and etiquette of the court. [¶] Also, just for the record, Mr. Chambasis' requests for pro per status, which he has now withdrawn, were equivocal, in that he wanted to go pro per only after being told that he was not going to have a change of lawyers and that his decisions were more of a reaction to that than a sincere desire to represent himself."

Chambasis argues the court abused its discretion in finding his request to represent himself untimely and forcing him to choose between keeping his current counsel for sentencing or representing himself without a continuance. We disagree.

A criminal defendant has a constitutional right to represent himself at trial if he makes a timely and unequivocal request to do so. (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1203.) But " 'when a defendant has elected to proceed to trial represented by

counsel and the trial has commenced, it is thereafter within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se.*' " (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1021, quoting *People v. Windham* (1977) 19 Cal.3d 121, 124 (*Windham*).) The factors a trial court must consider in determining whether to grant a midtrial request include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Windham, supra*, at p. 128.) The trial court need not expressly address all the relevant factors so long as the record reflects the court implicitly considered them. (*Scott, supra*, at p. 1206.)

In arguing that his request to represent himself was timely, Chambasis relies on *People v. Miller*. In that case, the defendant requested to represent himself after the trial ended but two months before his sentencing, and the trial court denied the request as untimely. (*People v. Miller, supra*, 153 Cal.App.4th at pp. 1019-1020.) The Court of Appeal reversed, reasoning that sentencing is a posttrial proceeding, so the defendant's request was timely made before that proceeding, and *Faretta* compelled the trial court to grant the defendant's request as long as it was knowing and intelligent. (*People v. Miller*, at pp. 1023-1024.) Later, however, the California Supreme Court in *People v. Doolin* (2009) 45 Cal.4th 390 (*Doolin*) found a *Faretta* request untimely when the defendant made it on the day scheduled for sentencing and requested a continuance to prepare. (*Doolin*, at p. 452.) The court distinguished *People v. Miller*, noting the defendant made the request in that case two months before sentencing, whereas

in *Doolin*, under the facts the "defendant's right to self-representation at sentencing was not absolute but subject to the court's discretion." (*Doolin*, at p. 455, fn. 39.)

We find *Doolin* controlling and find Chambasis's request to represent himself on the day of sentencing was untimely. *Doolin* makes clear that a request on the day of sentencing, like a request on the first day of trial, is untimely. (*Doolin, supra*, 45 Cal.4th at pp. 454-455; see *Windham, supra*, 19 Cal.3d at p. 128, fn. 5.) *People v. Miller*, on the other hand, involved a request made two months before sentencing, clearly not the circumstance here. Chambasis attempts to analogize to *People v. Miller* and distinguish *Doolin* by arguing he did not appear before the court during the seven weeks between the jury's verdict and his sentencing, so he moved to represent himself at his first opportunity before the court. But *Doolin* involved a similar four-week period between the verdict and sentencing, yet the court still found appellant's request at sentencing "manifestly untimely." (*Doolin, supra*, at pp. 452, 454.) Moreover, Chambasis has not explained why he could not have told his attorney during the period between the verdict and his sentencing that he wanted to represent himself, who could have then informed the court of his request.

Turning to the factors in *Windham*, we find no abuse of discretion. Although Chambasis had not shown a proclivity to substitute counsel, the court was reasonably concerned he was trying to "manipulate" the court to delay his sentencing. Throughout the proceeding, Chambasis showed a complete disrespect for the judicial process. As the trial court noted, during trial he attacked a witness, which caused a melee in the courtroom and resulted in him and the other defendants being

37

restrained during trial. The record further reflects that, after the verdicts were read, he said, "Fuck all you motherfuckers. This is Terra Bella gang, fool"; and at sentencing, he told the prosecutor, "Shut your bitch ass up." Moreover, Chambasis's disagreement with his counsel was largely over trial tactics and the trial court could not identify any issues with counsel's performance. Finally, Chambasis's request would have caused at least a month delay in his sentencing. (*People v. Valdez* (2004) 32 Cal.4th 73, 103 [" '[A] midtrial *Faretta* motion may be denied on the ground that delay or a continuance would be required.' "].) Thus, the trial court acted within its discretion in denying Chambasis's untimely *Faretta* request.

### 6. *Meraz's and Bibiano's Sentences to Life Without Parole*

Because Meraz was 16 years old and Bibiano was 17 years old at the time of the shooting, they challenge their sentences for life without parole as violating the Eighth Amendment prohibition against cruel and unusual punishment. Specifically, Bibiano argues the Eighth Amendment categorically bans all life without parole sentences for juveniles and they both argue California's life without parole scheme violates the United States Supreme Court's recent decision in *Miller v. Alabama* (2012) __ U.S. __ [132 S.Ct. 2455] (*Miller*), which prohibited the mandatory imposition of life without parole sentences for juveniles who commit homicide offenses. Bibiano further argues he was not among the category of juvenile offenders for which a life without parole sentence would be appropriate, and Meraz argues the trial court failed to consider his individual circumstances in sentencing him to life without parole. We reject each of these challenges.

*A. Legal Background*

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In recent years, the United States Supreme Court has narrowed the available punishments for juveniles under the Eighth Amendment. In *Roper v. Simmons* (2005) 543 U.S. 551, it held the Eighth Amendment bars capital punishment for juvenile offenders, and in *Graham v. Florida* (2010) 560 U.S. 48, it held the Eighth Amendment bars a sentence of life without parole for juveniles who commit nonhomicide offenses. (*Miller, supra*, __ U.S. at p. __ [132 S.Ct. at p. 2463].) Most recently, *Miller* held the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Id.* at p. ___ [132 S.Ct. at p. 2469].) It reasoned, "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of

39

rehabilitation even when the circumstances most suggest it." (*Id.* at p. \_\_\_ [132 S.Ct. at p. 2468].)

In California, section 190.5, subdivision (b) provides that the penalty for 16- or 17-year-old juveniles who commit special circumstance murder "shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1360 (*Gutierrez*).) "For two decades . . . , section 190.5(b) has been construed by our Courts of Appeal and trial courts as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of special circumstance murder." (*Ibid.*) In light of *Miller*, the California Supreme Court in *Gutierrez* overruled that line of authority and construed section 190.5, subdivision (b) to "confer[] discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, with no presumption in favor of life without parole." (*Gutierrez*, at p. 1360.) The court further held that "*Miller* requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender." (*Id.* at p. 1361.) As discussed in *Miller*, those attributes include (1) a juvenile offender's " 'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences' "; (2) "any evidence or other information in the record regarding 'the family and home environment that surrounds [the juvenile]—from which he cannot usually extricate himself—no matter how brutal or dysfunctional,' " including

"evidence of childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance"; (3) "any evidence or other information in the record regarding 'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him' "; (4) "any evidence or other information in the record as to whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys' "; and (5) "any evidence or other information in the record bearing on 'the possibility of rehabilitation,' " including the extent or absence of criminal history. (*Gutierrez*, at pp. 1388-1389.)

*B. Challenges to California's Sentencing Scheme*

In their appellate briefs filed before *Gutierrez*, Meraz and Bibiano attacked the constitutionality of section 190.5, subdivision (b) based on *Miller*. *Gutierrez* now forecloses those arguments. Bibiano argues the Eighth Amendment as construed in *Miller* bars life without parole sentences for all juvenile offenders. The court in *Miller* left that issue open, although it noted, "[G]iven all we have said in *Roper, Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. . . . Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences

41

counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra*, __ U.S. at p. __, citation omitted [132 S.Ct. at p. 2469, citation omitted].) In *Gutierrez*, our Supreme Court interpreted *Miller* as holding that "a state may authorize its courts to impose life without parole on a juvenile homicide offender when the penalty is discretionary and when the sentencing court's discretion is properly exercised in accordance with *Miller*." (*Gutierrez, supra,* 58 Cal.4th at p. 1379.) We are bound by *Gutierrez*'s interpretation of *Miller* and reject Bibiano's challenge. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Meraz and Bibiano both argue section 190.5, subdivision (b) violates the Eighth Amendment because it creates a presumption in favor of life without parole for juvenile homicide offenders. As noted, before *Miller*, this provision was judicially construed to create such a presumption. (*Gutierrez, supra*, 58 Cal.4th at p. 1360.) However, *Gutierrez* construed the statute to eliminate any presumption, thereby avoiding any constitutional infirmity. (*Id.* at p. 1387.)[12]

---

[12] Bibiano further argues section 190.5 is not saved by the recent enactment of section 1170, subdivision (d)(2), which generally allows a person sentenced to a crime committed while he was under 18 years of age to petition for resentencing after serving at least 15 years, provided certain requirements are met. (§ 1170, subd. (d)(2); *Gutierrez, supra*, 58 Cal.4th at pp. 1384-1385.) The court in *Gutierrez* agreed the enactment of this provision did not remedy the problem with a presumptive life without parole sentence for juveniles pursuant to section 190.5, subdivision (b). (*Gutierrez, supra*, at pp. 1385-1387.)

*C. Challenges to Meraz's and Bibiano's Sentences*

Meraz further argues the trial court in this case failed to take into account the relevant factors under *Miller* and *Gutierrez* in sentencing him to life without parole and Bibiano contends he was not among the category of juvenile homicide offenders for whom life without parole is a constitutionally permissible sentence. They were sentenced after *Miller* but before *Gutierrez*. Nevertheless, we find the trial court was aware of the relevant factors related to their youth and acted within its discretion given the limited record before it in sentencing both of them to life without parole.

In a prehearing sentencing memorandum filed after *Miller*, the prosecutor requested life without parole for both appellants, citing their violent natures and the violent nature of the crimes. Although the memorandum acknowledged the trial court had discretion to impose life without parole on Meraz and Bibiano as minors, it did not mention *Miller* or any of the other factors set forth in *Miller*. Neither counsel for Meraz nor Bibiano submitted a sentencing memorandum. At both Meraz's and Bibiano's sentencing hearings, the trial court indicated it had read their preplea probation reports. Those reports described the circumstances of the current crimes and noted each appellant's juvenile criminal history: Meraz had a juvenile history of assault and assault with great bodily injury, and Bibiano had a juvenile history of vehicle theft, receiving stolen property, and criminal threats. The report contained no discussion of the other youth-related factors set out in *Miller*, but when asked after trial, counsel for both Meraz and Bibiano declined to request presentence reports and stipulated to the trial court using the preplea reports for sentencing. At both sentencing hearings,

43

neither defendant nor any witnesses gave statements, although the trial court provided the opportunity to do so.

At Meraz's hearing, his counsel argued against life without parole because Meraz was 16 years old at the time of the offense and "under the new case law it would be cruel and unusual punishment to sentence him as such." The prosecutor responded, "the People are asking for [a life without parole] sentence, given the double homicide. The case law that [Meraz's counsel] is referring to does not apply in this case, and the appropriate sentence is life without possibility of parole." The court stated it had reviewed *Miller*, as well as *People v. Caballero* (2012) 55 Cal.4th 262, and *People v. Moffett* (review granted Jan. 3, 2013, S206771, remanded by, superseded by, *sub nom. Gutierrez, supra*, 58 Cal.4th 1354),[13] and that it was "aware of" section 190.5, subdivision (b), all of which was "part of my thought process in terms of arriving at the appropriate sentence."

The court then extensively described the circumstances of the current crimes:

"[O]n the date of these offenses Mr. Meraz possessed a firearm, loaded, conspired with two other fellow gang members. Each of them possessed additional firearms. And they entered

---

[13]   *People v. Caballero* held that imposing an aggregate term of over 100 years on a juvenile for a nonhomicide offense violated the Eighth Amendment. (*People v. Caballero, supra*, 55 Cal.4th at p. 265.) *People v. Moffett* was one of the two appeals the Supreme Court considered in *Gutierrez*. The Court of Appeal in that case remanded the defendant's life without parole sentence in light of *Miller* to allow the trial court to consider the defendant's murder count without reference to a presumption in favor of life without parole. (*Gutierrez, supra*, 58 Cal.4th at p. 1365.)

into rival gang territory seeking a revenge killing in retaliation for a previous murder of one of their own that was believed to have been perpetrated by a rival gang. That, I think, was the logical interpretation of the evidence.

"And in committing these crimes, all of the three defendants, including Mr. Meraz, walked directly into the heart of their rival's territory in broad daylight, without any disguises or cover, and approached a porch where the three victims were standing or seated, unarmed, caught by surprise, and completely defenseless.

"The defendant and his two companions surrounded each of those victims from all sides to prevent escape. In the manner of a firing squad execution essentially is what it was, each of them together, they simultaneously fired multiple rounds at these three victims, killing two and severely wounding one. There were young children at play at the time and other persons who were in the house directly behind where the victims were standing or seated on that porch.

"The manner in which these killings took place, in this court's view, was brazen and meant to send a clear message to their rivals. And in the perpetration of these crimes the defendant was an actual shooter, having personally discharged a firearm, causing death, for the benefit of his gang. And these are consistent with the jury's findings. The evidence clearly established in this court's view that in each of the murders and the attempted murder the defendant was an active participant and intended to kill his victims, having fired at close range, firing multiple times at all victims who were in close proximity to one another on that porch.

"The court further derives from the evidence that the defendant's actions were planned, they were premeditated, and they demonstrated a high degree of cruelty, viciousness, and callousness. I've also reviewed the probation report and note that the defendant has a criminal history, which also includes previous acts of violence and threat of violence as one could read from that report.

"All of these factors that I have just spoken of together warrant in my view the imposition of a sentence of life without the possibility of parole, and that is notwithstanding that the defendant was 16 years of age at the time that he committed these crimes. In that process the court has reviewed and weighed and considered lesser penalties, including life sentences with substantial custody time but with the possibility of parole. But in light of—and it has reviewed the cases that I just talked about earlier. But I do find that these factors in aggravation so far outweigh anything that would mitigate to a lesser sentence that it causes me to believe that a life sentence without the possibility of parole is the appropriate sentence in this case."

At Bibiano's hearing, Bibiano's counsel briefly delved into Bibiano's upbringing, pointing out he had a "very bad childhood. . . . His mother left him in Mexico, came to L.A. and then sent for him several years later. And within three months of him arriving in L.A., he was in foster care and part of the system. [¶] He then came out of foster care, stayed with his mother about two or three months; and she sent him to Atlanta to live with his father. His father sent him back to his mother, and then he went back into foster care. [¶] And as a result of not having a nurturing mother, who chose her boyfriend over her children, my client drifted into the gang lifestyle. So—which

showed his poor judgment and ended up resulting in this conviction because of the poor choices he made, which I think were attributable to the fact that he was 17 when the crimes were committed and at 17 he didn't have a fully developed mind. He had the mind-set of an adolescent, of a person under the age of 18." Bibiano's counsel reminded the court of its discretion under section 190.5, subdivision (b) and argued "in light of *Miller versus Alabama* and some other recent cases that have come up, saying that [life without parole] for juveniles is cruel and unusual punishment under the Eighth Amendment and a sentence of [life without parole] for a juvenile and somebody Mr. Bibiano's age is basically a death sentence. He's right now 21 years old. And that leaves no room for him to show any rehabilitation or maturity or anything that he might attain at this point forward showing that he should be given a chance to have some meaningful opportunity for rehabilitation and re-entry into society."

The prosecutor responded, "[D]espite whatever adversity, the choice was made to go into the gang and the choice was made to ambush two—three defenseless victims and slaughter them. And, given that choice, [a life without parole] sentence is appropriate."

The court acknowledged it was "aware of the cases that you're citing and the statutes that you're citing for the defense and has reviewed those. I would indicate that none of those cases preclude a life without parole sentence for a person between the ages of 16 and 18; but most importantly it requires the court to exercise discretion and consider lesser punishment, which, of course, I have done. I'm also taking into account the statements that you just addressed with regard to Mr. Bibiano's background.

So I have taken, I believe, everything that I've had before me into consideration in making this decision."

Then, as it had done at Meraz's sentencing, the court extensively described the circumstances of the current crimes:

"Balancing what you've said about his background with what are very obviously patent aggravating factors here, I just want to go over some of those to put this in proper context. When these offenses were committed, we start out with Mr. Bibiano having taken possession of a loaded firearm. We also have him having conspired with two other fellow gang members of the Terra Bella gang, who themselves each possessed additional firearms. They entered into rival gang territory seeking revenge and retaliation for a previous murder that had occurred, the murder of one of their own and which they believed to have been perpetrated by a rival, this rival gang. So that is the background context.

"But in committing these crimes, all three defendants, Mr. Bibiano as active as any of the others, walked directly into the heart of their rival's territory in broad daylight, without any disguises or cover, and approached a porch where there were three young men standing or sitting. They were, these victims, unarmed at the time. They were completely caught by surprise and completely defenseless at the time of the shootings in this case.

"The defendant, Mr. Bibiano, and his two companions, all armed at the time, surrounded their victims from all sides to prevent escape; and in the manner of a firing squad execution, each and together they simultaneously fired numerous, numerous rounds at the three victims, killing two of them and severely wounding the third.

48

"There were children at play, young children at play at the time. And there were other civilians inside of the house at the time of the shootings, and that house was directly behind where the three victims were standing or seated near the front door of that location.

"Very clearly, these murders were carried out in a brazen way, meant to send a very clear message to their rivals. This was not of the type that took place in the dark of night or with disguises. This was, as I said, in broad daylight, three of them, Mr. Bibiano included, committing these horrendous crimes for the benefit of their gang and with Mr. Bibiano personally discharging a firearm, causing death. These are findings that were made by the jury.

"The evidence that I listened to and that the jury listened to established that, as to each of these murders and the attempted murder, that Mr. Bibiano was an active rather than a passive participant and that he intended to kill his victims at the time these crimes were committed, having fired at close range, multiple times at all victims, who were in close proximity to one another on that porch.

"These are aggravating factors that cannot be ignored by this court because the actions of Mr. Bibiano demonstrate a very high degree of cruelty and viciousness and a callous disregard for life. And when you take these facts all together and you balance them with the factors in mitigation that you've referred to and . . . also take into consideration that he was not of an age of majority at the time . . . . [¶] . . . [¶]

"The court considered an array of choices or options. In considering the life without the possibility of parole option, I also considered lesser punishments, as I'm required to do. Those

49

lesser punishments, in and of themselves would be severe, including life sentences with substantial amounts of prison time. But notwithstanding that, the court does believe that the sentence of life without the possibility of parole, in light of these aggravating factors that far outweigh any of the mitigating factors in my view, the court believes that a life sentence without the possibility parole is the appropriate sentence in this case."

We conclude this record sufficiently supported the trial court's exercise of discretion to sentence both defendants to life without parole. While the hearings took place before *Gutierrez*, that case would not have significantly impacted the trial court's review. *Gutierrez* eliminated the presumption of life without parole in section 190.5, but the trial court here already understood it had discretion under section 190.5. Further, *Gutierrez* simply reiterated the relevant youth factors from *Miller*, and the trial court acknowledged the existence of *Miller* and other related cases.

For Meraz, it is true the court did not discuss any specific information bearing on his youth, but the record reflects that information was not presented to the court, given counsel declined to request an updated sentencing report from probation, present a sentencing memorandum, or argue any factors other than Meraz's age. On this limited record, we cannot fault the trial court for not considering these factors. (See *Gutierrez, supra*, 58 Cal.4th at p. 1390 ["To be sure, not every factor will necessarily be relevant in every case. For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have mitigating relevance."].) The court stated that it had considered Meraz's

age, but placed significant weight on the circumstances of the crime, which were unquestionably heinous—a calculated, execution-style retaliatory shooting of three unarmed individuals in broad daylight with children around.  There was also significant evidence all the appellants were shooters and therefore active participants in the crimes.  (*Id.* at p. 1389 [considering " 'the extent of [the juvenile defendant's] participation in the conduct' "].)  The court also considered Meraz's violent criminal history.  While Meraz points to the fact that peer pressure might have affected him during the shooting (*ibid.*), given Chambasis was 22 years old at the time of the shooting and may have been the "shot caller" giving orders, the trial court was aware of that evidence from the trial.  Again, on this record, we are satisfied the court understood and acted within its discretion in sentencing Meraz to life without parole.

Unlike with Meraz, Bibiano does not argue the trial court failed to consider the proper factors in sentencing him to life without parole; instead, he argues the information before the court demonstrated he was not the uncommon type of juvenile offender for which life without parole could be constitutionally imposed.  We disagree.  In contrast to Meraz's sentencing, at Bibiano's sentencing, his counsel argued mitigating factors related to Bibiano's traumatic upbringing and immature mindset.  On appeal, Bibiano points to evidence at trial that might have demonstrated his youth, such as possible peer pressure from Chambasis, his comment that he was "going to hell" as he watched the news broadcast of the shooting, and his crying in response to officers questioning him about the murders.  He also suggests his youth might have caused him to reject a 30-year plea offer before trial, only to then ask after trial whether the offer

51

was still available.  The trial court was aware of all this information, yet as with Meraz, the court found the heinous circumstances of the crime outweighed any mitigating circumstances.  It is also important to note at the time of the crimes in this case, Bibiano was two months shy of his 18th birthday.  The evidence relevant to the *Miller* youth factors was not so overwhelming that the trial court could not constitutionally impose life without parole on Bibiano.  Thus, we find no error.

## 7.  *Remaining Sentencing Issues*

Appellants raise various errors in their sentences.  We find several of their arguments meritorious, so we will modify their abstracts of judgment to correct the errors.

### A.  *Sentences on Count 4*

Joined by Meraz, Chambasis argues the trial court should have stayed his sentence on count 4 for shooting at an inhabited dwelling, rather than imposing a concurrent term of life without parole, because count 4 was directly related to the murders and attempted murder in counts 1, 2, and 3.  In a sentencing memorandum, the prosecution recommended the sentence on count 4 be stayed.  At Chambasis's sentencing, the court explained it was imposing a concurrent sentence for count 4 because "the court believes that primarily it was the same victims in counts 1, 2, and 3 that were the targets of Mr. Chambasis' actions on that date."  We find the trial court was not required to stay the sentence on count 4.

Under section 654, subdivision (a), "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the

52

act or omission be punished under more than one provision." "There is a multiple victim exception to . . . section 654 which allows separate punishment for each crime of violence against a different victim, even though all crimes are part of an indivisible course of conduct with a single principal objective. [Citation.] An assailant's greater culpability for intending or risking harm to more than one person precludes application of section 654." (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1630-1631 (*Felix*).)

Our decision in *Felix* is directly on point. In that case, the defendant attempted to murder one victim by firing gunshots through a bedroom window. Relatives of the victim were staying in other rooms in the house. (*Felix, supra*, 172 Cal.App.4th at p. 1623.) The defendant was convicted of attempted murder of the intended victim, shooting at an inhabited dwelling, and several counts of assault with a firearm against the intended victim and his two daughters, but not the other relatives in the house. The sentence for the shooting at an inhabited dwelling count was ordered to run concurrent with the sentence on the attempted murder count. (*Id.* at pp. 1623-1624.) The defendant argued the sentence for the shooting at an inhabited dwelling count should have been stayed because it was based on the same act, committed during a single indivisible course of conduct. We disagreed because, "where the crime of shooting at an inhabited residence is involved, a defendant need not be aware of the identity or number of people in the house to be punished separately for each victim." (*Id.* at p. 1631.) Section 654 did not apply because the intended victim's houseguests "were victimized by the shooting into the dwelling but were not named victims in any other count." (*Felix*, at p. 1631.)

Here, appellants opened fire on Zamora, Curiel, and Santa Ana while they sat on the porch of Hurtado's apartment. Some of the bullets struck the front door and the wall next to it. Hurtado and her children were inside at the time, but they were not named in any of the four counts against appellants. At sentencing, the trial court noted the shooting at an inhabited dwelling count "primarily" involved victims Zamora, Curiel, and Santa Ana, suggesting other victims were involved. By shooting at Hurtado's occupied apartment, appellants committed a separate act of violence against different victims, so the trial court was not required to stay their sentences on count 4 pursuant to section 654.

B. *Section 186.22, Subdivision (b)(1)*

For counts 1 and 2, the court imposed and stayed a gang enhancement pursuant to section 186.22, subdivision (b)(1) for all appellants. Appellants argue the court was not permitted to impose any additional term under section 186.22, subdivision (b)(1) because section 186.22, subdivision (b)(5) applied. We agree.

Section 186.22, subdivision (b)(1) states: "Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished" to an additional term of imprisonment. For murder, that additional term is 10 years. (§ 186.22, subd. (b)(1)(C).) Section 186.22, subdivision (b)(5) provides, "any person who

54

violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served."

Appellants contend their life without parole sentences triggered section 186.22, subdivision (b)(5), so the trial court improperly imposed enhancements under section 186.22, subdivision (b)(1). In *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), the California Supreme Court struck a section 186.22, subdivision (b)(1) enhancement for a 25-years-to-life sentence for first degree murder, concluding section 186.22, subdivision (b)(5) exempts crimes carrying with them both straight life terms and years-to-life terms. (*Lopez*, at p. 1007.) The court did not address whether life without parole sentences fall within section 186.22, subdivision (b)(5), but in discussing the legislative history of the provision, it noted without analysis that, at the time the predecessor to that provision was enacted, it "was understood to apply to *all* lifers, except those sentenced to life without the possibility of parole." (*Lopez*, at p. 1010.)

Respondent cites this passage and argues that finding section 186.22, subdivision (b)(5) applicable "would make little sense" because life without parole means appellants will never be eligible for parole. The court in *Lopez* rejected a similar argument. In that case, the Attorney General argued against applying section 186.22, subdivision (b)(5) to first or second degree murderers because it would have "no practical effect," given the minimum parole eligibility term for first degree murderers is 25 years and for second degree murderers is 15 years. (*Lopez, supra*, 34 Cal.4th at p. 1009.) Citing legislative history providing that " 'if any provision in this act conflicts with another section of law which provides for a greater penalty or

55

longer period of imprisonment that the latter provision shall apply,' " the court reasoned it was "neither an absurdity nor an anomaly" that section 186.22, subdivision (b)(5) would apply even if a first degree or second degree murder sentence carried the same or a longer minimum parole term. (*Lopez*, at p. 1009.)

Following the plain language of section 186.22, subdivision (b)(5) and the reasoning in *Lopez*, rather than its passing dicta about life without parole sentences, we find the trial court improperly imposed and stayed additional terms pursuant to section 186.22, subdivision (b)(1). Section 186.22, subdivision (b)(5) applies to "a felony punishable by imprisonment in the state prison for life" and life without parole plainly qualifies. As *Lopez* explains, although section 186.22, subdivision (b)(5) will not set the minimum parole term for appellants' life without parole sentences here, it still applies. Thus, we will modify each appellant's judgment to delete the section 186.22, subdivision (b)(1) enhancement.

*C. Parole Revocation Fine*

Appellants contend and respondent concedes the trial court erred in imposing parole revocation fines in light of their sentences to life without parole. (§ 1202.45.) They are correct. Section 1202.45 requires assessment of a parole revocation restitution fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole." It does not apply to a sentence with no determinate term. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.) It also does not apply when any determinate term is stayed. (*People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6.) Here, appellants were sentenced to indeterminate terms on all counts and the determinate terms for

the enhancements were stayed. Therefore, we will strike the fine for each appellant.

*D. Custody Credits*

Each appellant argues he should have received additional presentence custody credit. Respondent concedes the errors. Chambasis is therefore entitled to 1,173 days of presentence custody credit, Meraz is entitled to 1,166 days of presentence custody credit, and Bibiano is entitled to 1,167 days of presentence custody credit.[14] We will correct the abstracts of judgment to reflect the correct presentence custody credit.

*E. Fees*

We have identified two errors in the fees imposed in the abstracts of judgment. They incorrectly reflect an $80 court security fee when the trial court imposed a $160 court security fee at each appellant's sentencing hearing. The court's oral pronouncement controls so we will order each appellant's abstract of judgment corrected to reflect a $160 court security fee. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864.) At appellants' sentencing hearings, the trial court also imposed a $30 criminal conviction assessment on each appellant. Each abstract of judgment reflects a $60 criminal conviction assessment. Neither is correct. The trial court was required to impose a $30 assessment per count, for a total assessment of $120. (Gov. Code, § 70373; *People v. Sencion* (2012) 211 Cal.App.4th 480, 483.) We will order the abstracts of judgment corrected accordingly.

---

[14] Bibiano contends he is entitled to 1,166 days of presentence custody credit, but by respondent's and our calculations, he is entitled to 1,167.

57

## DISPOSITION

We modify each appellant's judgment to strike the section 186.22, subdivision (b)(1) enhancement, to strike the section 1202.45 parole revocation fine, to impose a $160 court security fee, and to impose a $120 criminal conviction assessment. We further modify Chambasis's abstract of judgment to reflect 1,173 of presentence custody credits, modify Meraz's abstract of judgment to reflect 1,166 days of presentence custody credit, and modify Bibiano's abstract of judgment to reflect 1,167 days of presentence custody credit. The trial court is directed to forward the corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

We affirm the judgments as modified.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.

58